IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**JANET CRUZ-RIDOLFI,**                    Case No. 1:17 CV 1075

     Plaintiff,                         Judge John R. Adams

     v.                                Magistrate Judge James R. Knepp, II

**COMMISSIONER OF SOCIAL SECURITY,**

     Defendant.                         REPORT AND RECOMMENDATION

## INTRODUCTION

Plaintiff Janet Cruz-Ridolfi ("Plaintiff") filed a Complaint against the Commissioner of Social Security ("Commissioner") seeking judicial review of the Commissioner's decision to deny disability insurance benefits ("DIB") and supplemental security income ("SSI"). (Doc. 1). The district court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). This matter has been referred to the undersigned for preparation of a report and recommendation pursuant to Local Rule 72.2(b)(1). (Non-document entry dated May 23, 2017). For the reasons stated below, the undersigned recommends the decision of the Commissioner be reversed and remanded for further proceedings.

## PROCEDURAL BACKGROUND

Plaintiff protectively filed for DIB and SSI in December 2013, alleging a disability onset date of January 1, 2012. (Tr. 232-33, 240). Her claims were denied initially and upon reconsideration. (Tr. 169, 173, 183, 190). Plaintiff then requested a hearing before an administrative law judge ("ALJ"). (Tr. 195). Plaintiff (represented by counsel), and a vocational expert ("VE") testified at a hearing before the ALJ on December 7, 2015. (Tr. 33-78). On March

25, 2016, the ALJ found Plaintiff not disabled in a written decision. (Tr. 13-24). The Appeals Council denied Plaintiff's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1-9); *see* 20 C.F.R. §§ 404.955, 404.981, 416.1455, 416.1481. Plaintiff timely filed the instant action on May 23, 2017. (Doc. 1).

FACTUAL BACKGROUND

Personal Background and Testimony

Plaintiff was born in June 1962, making her 49 years old on her alleged disability onset date, and 53 years old at the time of the hearing. *See* Tr. 233. In a disability report, Plaintiff alleged disability due to depression, anxiety, fibromyalgia, back problems, right rotator cuff injury, diabetes, asthma, sleep apnea, and essential tremors in both hands. (Tr. 285). Plaintiff lived in an apartment with her children, and was supported by her husband (from whom she was separated). (Tr. 49-50).

Plaintiff testified that she had not worked since 2011 due to a "deep depression", "back problems, the shaking in [her] hands and legs [was] starting to increase slowly", and "problems with the bright lights . . . . [which] would cause [her] migraine headaches." (Tr. 46). She testified that shaking in her body ("it goes down into my legs") made it difficult and painful for her to stand for long periods of time. (Tr. 56). She also testified to pain in her lower back ("towards my hip and tailbone") caused standing to be painful. (Tr. 57). She estimated she could stand for "45 minutes to a half hour" before having the pain. *Id.* She used a back brace and a TENS unit to treat her back pain. (Tr. 57-58). Plaintiff's children helped with chores. (Tr. 52). And her husband came to do the laundry every two weeks. *Id.*

Plaintiff also had asthma, for which she used inhalers and a nebulizer, and has been hospitalized twice. (Tr. 58-59).

2

Plaintiff was diagnosed with carpel tunnel in both hands, worse in her left hand "since [she] broke [her] pinky walking [her] dog." (Tr. 59). She wore braces at night for this condition, and had some "lighter wrist bracelets" that she used for daytime hand numbness. (Tr. 60). She stated her "hands go numb maybe four times a week during the day." *Id.*

Plaintiff also testified to problems with her right arm due to a tear in her right shoulder. (Tr. 61). She had also been given a walker by physical therapy (through Southwest Hospital) because her balance had "gotten very, very bad." (Tr. 56). She used it outside the home, and used a cane at home. (Tr. 56-57).

Regarding her mental health, Plaintiff testified to anxiety and depression. (Tr. 60). She took prescribed Valium on an as needed basis. (Tr. 61) ("I'm supposed to use it when I have panic attacks."). She also used coping mechanisms "that Ms. King, [her] psychologist ha[d] taught [her] to do, to help calm [herself]." *Id.*

Plaintiff had seen primary care physician Judith Walters for "[o]ver 20 years." (Tr. 64).

Relevant Medical Records

*Physical Health Records Prior to Alleged Onset Date*

In February 2011, Plaintiff underwent an EMG study, which showed "bilateral median sensory mononeuropathy across the wrist". (Tr. 1768). She was given a left carpal tunnel steroid injection. (Tr. 1761).

That same month, Plaintiff underwent a consultation with a rheumatologist. (Tr. 909-11). Rula Hajj-Ali, M.D., noted eighteen out of eighteen tender points, and agreement "with the diagnosis of Fibromyalgia/chronic fatigue syndrome." (Tr. 911). Dr. Hajj-Ali ordered blood work (Tr. 914-17) to rule out other etiologies for Plaintiff's condition (Tr. 911).

3

In December 2011, Plaintiff saw neurologist Marek Buczek, M.D., Ph.D., for a consultation regarding chronic neck pain and chronic headaches. (Tr. 509). Plaintiff reported "mild bifrontal headache and slight neck pain, but denies any back pain." (Tr. 510). She had "prominent tenderness in the cervical paraspinal muscles and shoulder girdle muscles bilaterally." *Id.* Dr. Buczek found "decreased light touch, pinprick and temperature in the stocking/glove distribution bilaterally and symmetrically suggestive of peripheral neuropathy." *Id.* He did not "see any tremors or fasciculations" and the remainder of the neurologic examination was normal. *Id.* Her gait was "slightly wide based, but is otherwise stable." *Id.* Dr. Buczek assessed transformed migraine headaches, peripheral neuropathy of unclear etiology, cervical radiculopathy, and diffuse myofascial pain. (Tr. 511).

*Mental Health Records Prior to Alleged Onset Date*

In May 2011, Plaintiff underwent a psychological examination with Yelena Chernyak, Ph.D. (Tr. 924-28). On mental status examination, Plaintiff had "fair eye contact and rapport was difficult to establish." (Tr. 927). She "appeared to be perplexed", "was only somewhat cooperative", and her "[a]ffect appeared labile and tearful." *Id.* Her speech "was pressured" and "[p]sychomotor activity was low." *Id.* Plaintiff "reported suicidal / homicidal ideation", but "was further evaluated to have no intent, plan, means, [or] past attempts". *Id.* Dr. Chernyak noted Plaintiff was "reporting extremely high levels of anxiety and depression for which she has discontinued pharmacological treatment against medical advice" and had "been nonadherent to pain and OSA treatment and states motivation for treatment only in the use of sleep aids and OSA treatment." *Id.* Dr. Chernyak assessed: insomnia and anxiety disorder not otherwise specified, with differential diagnoses of bipolar disorder not otherwise specified and major depression. *Id.*

4

In November 2011, Plaintiff was voluntarily admitted to Oakview Behavioral Health after presenting to the emergency room "for depression upon recommendation of her psychiatrist." *See* Tr. 1265. She reported a worsening of her mental health symptoms over the prior six months. *Id.* She was assessed with Bipolar II disorder, depression, and recommended for a two to three day inpatient stay. (Tr. 1267-68).

*Physical Health Records After Alleged Onset Date*

Plaintiff underwent a cervical MRI in January 2012, which showed degenerative disc disease with mild bulging at C5-C6. (Tr. 498)

In February 2012, Plaintiff underwent an EMG which showed "a mild, generalized, chronic, axonal, sensorimotor peripheral polyneuropathy without denervation." (Tr. 518). There was no evidence of myopathy or carpal tunnel syndrome. *Id.*

In March 2012, Plaintiff was treated for left hand thumb pain. (Tr. 741-42). X-rays "demonstrated nothing acute", and the physician assessed tendosynovitis of the thumb. (Tr. 742).

In May 2012, Plaintiff underwent a Pain Medicine Evaluation with psychologist Kelly Huffman, Ph.D. (Tr. 1034-37).[1] Her "[a]ffect varied between anxious, depressed and extremely tearful." (Tr. 1037). Dr. Huffman's impression was: fibromyalgia, low back pain, headache, bipolar II by history, major depression, pain disorder with medical and psychological features. (Tr. 1037). Plaintiff was "[o]ffered admission to the Chronic Pain Rehabilitation Program, pending review of records." *Id.* The goals were "[p]ain reduction, functional restoration, mood normalization, improved coping, [and] vocational rehab"; her prognosis was "good". *Id.*

---

1. The evaluation bears a date of March 30, 2011, and an "update" date of May 21, 2012. (Tr. 1034). But the text indicates the evaluation is from May 2012. *Id.* ("She was initially evaluated for entrance into the CPRT Mar 30th, 2011 but didn't attend due to workplace obligations. She is now unemployed and feels able to attend.").

In August 2012, Plaintiff underwent a bone density scan which revealed "[o]steopenia in the lumbar spine, but normal bone density in the left hip". (Tr. 1196).

In October 2012, Plaintiff reported to her rheumatologist that she had "intense pain" in her arms, legs, and hips, exacerbated with activity. (Tr. 1236). She also reported dropping objects. *Id.* Notes indicate diffuse tenderness in the thorax, thighs, and upper arms, as well as tenderness at the wrists. *Id.* She was diagnosed with bilateral carpal tunnel syndrome, diabetes, asthma, and fibromyalgia. *Id.*

At a March 2013 neurological examination with Melanie Taylor, M.D., Plaintiff reported she had "noticed tremors over the last year" in her arms and legs and "worsening of balance". (Tr. 931).[2] She reported having fallen three times in the past month, and seven times in the past year. *Id.* She did not "use a cane or walker." *Id.* Plaintiff stated "[s]he does not feel tremor interferes with life such as writing, eating, drinking." *Id.* Plaintiff "denied resting tremor" and reported "mostly problems with action tremor (such as holding both hands together)". (Tr. 932). She denied problems standing up from a chair or getting in and out of a vehicle. *Id.* Dr. Taylor noted Plaintiff "denied problem with making U-turns while walking" and that "[s]he may walk slower but she denied shuffling." *Id.* On examination, her sensation was diminished to light touch and temperature "stocking/glove". (Tr. 933). Her gait was "normal-based". *Id.* Dr. Taylor assessed Plaintiff's "tremor appears to be benign physiological tremor" and noted Plaintiff "does exhibit signs of central sensitization syndrome as well." *Id.* She noted Plaintiff's "gait imbalance is likely multifactorial with PN, pain, and de-conditioning []", and recommended both physical therapy and participation in a chronic pain rehabilitation program. (Tr. 933-34). She also recommended a

---

2. This record is repeated twice in the transcript. *See* Tr. 931-35 and Tr. 1372-76.

neurosurgery opinion regarding cervical disc bulging and an EMG and hand surgeon evaluation for possible carpal tunnel syndrome treatment. *Id.*

In May 2013, Plaintiff went to the emergency room with right shoulder pain "for the past 2 days which is made worse by movement." (Tr. 1180). Imaging was normal. (Tr. 1140).

A June 2013 MRI of Plaintiff's right shoulder showed a partial tear of the supraspinatus tendon, and tendinosis in that tendon. (Tr. 970-71, 1143-44). The following month, Plaintiff underwent a shoulder injection with Robert J. Gillespie, M.D. (Tr. 1169-70).

In July 2013, Plaintiff saw Patrick J. McIntyre, M.D. in the Division of Pain Medicine. (Tr. 981-82). Plaintiff reported neck pain "that radiates into both of her arms" as well as some low back pain. (Tr. 981). The pain radiated into her hand, and was associated with numbness and tingling. *Id.* Dr. McIntyre noted Plaintiff had weakness "but she does not actually have any history of dropping any objects." *Id.* Plaintiff reported pain worse with activity and improved with rest; she was participating in physical therapy. *Id.* On examination, Dr. McIntyre noted Plaintiff "rises slowly from the seated position" and "walks with a non-antalgic gait". (Tr. 982). Her upper and lower extremity strength was intact "although the maneuvers are uncomfortable for the patient." *Id.* Her cervical and lumbar ranges of motion were reduced and she had tenderness to palpation "throughout the paravertebral musculature" in her spine. *Id.* Her straight leg raising test was positive. *Id.* Dr. McIntyre noted a diagnosis of cervical disc displacement, cervical disc degeneration, cervical spondylosis, and cervical radiculitis. *Id.* He explained he and Plaintiff "had a very long discussion regarding the importance of physical therapy and exercise in her recovery" and he "encouraged . . . [her] to continue to participate." *Id.* He also noted she was a candidate for cervical epidural steroid injection. *Id.*

MRIs performed in July 2013 showed a "broad-based annular displacement at the C5 level without evidence of frank disc herniation or canal stenosis" in Plaintiff's cervical spine (Tr. 962), and a "[n]egative MRI of the lumbar spine" (Tr. 863). In August 2013, Plaintiff underwent an epidural steroid injection at C6-C7. (Tr. 983).

In December 2013, Plaintiff saw Van Warren, M.D., for neck, lower back, and thigh pain. (Tr. 2466). She reported neck and shoulder pain, improved after cervical epidural nerve blocks. *Id.* She noted her lower back and bilateral thigh pain were worse when standing from a supine or seated position. *Id.* Dr. Warren observed tenderness and pain in Plaintiff's shoulders, as well as tenderness in Plaintiff's lower back and thighs. (Tr. 2468). Her straight leg raise was normal. *Id.* He assessed fibromyalgia and rheumatoid arthritis. *Id.*

In January 2014, a nurse at Ohio Guidestone observed hand tremors. (Tr. 2419).

In March 2014, Plaintiff returned to Dr. Warren. (Tr. 2462-65).[3] She reported "severe pain involving the lower back" and "pain in the shoulders." (Tr. 2462). Dr. Warren noted "moderate tenderness over the lower back bilaterally", normal straight leg raises in the seated position, "pain on passive range of motion of the right shoulder", and "decreased fine touch sensation over the lower abdomen bilaterally." (Tr. 2465). Her gait was normal. *Id.* Dr. Warren assessed diabetes, fibromyalgia, degenerative arthritis of the lumbar spine with radicular symptoms into the lower abdomen bilaterally, and depression. *Id.*

That same month, Plaintiff underwent an initial chronic pain evaluation. (Tr. 1321-26). She did not have an ambulatory aid. (Tr. 1323). The examiner noted "major loss of cervical, thoracic and lumbar range of motion, decreased strength in legs and core muscles, poor postural awareness

---

3. This record is duplicated at Tr. 1223-27.

and inconsistencies (in range of motion testing inconsistent in neck and lumbar spine)." (Tr. 1325).

Under the plan of care, the provider noted:

> Fall risk screen did place the patient at increased borderline risk of falls based on timed up and go score but this appeared to be due to poor effort. No assistive device recommended at this time. She may benefit form general stretching and strengthening, core work and shoulder if not not [sic] enough from OT during individual Physical Therapy sessions. Recommend treatment in an interdisciplinary pain program. Barriers to progress to include failed previous PT and she seems unreceptive to suggestions at this point.

*Id.* Plaintiff was discharged from the program a few days later. *See* Tr. 1354. On examination, the provider noted similar findings as before, but also: "inconsistencies (in range of motion testing inconsistent in neck and lumbar spine: MUCH better when not aware of evaluation)." (Tr. 1359). Notes indicate Plaintiff had been "cut off" from Ambien for "abusing the medication" and that she had "recently began obtaining Ambien again and is already over-using the medication, taking it almost every night instead of the initially-reported 'once or twice a week.'" *Id.* The provider noted Plaintiff could return to work "as desired", her activity level was "[u]nrestricted" and her progress was "poor". (Tr. 1360).[4]

In June 2014, Plaintiff reported to Dr. Warren inability to complete the pain management program "because she was unable to have sufficient family members to participate in the program." (Tr. 1580). She had pain in her shoulders, lower back, and hips and had been off her Lyrica medication for three weeks. *Id.* On examination Dr. Warren noted "good range of motion of the upper and lower extremity joints except for some mild limitation to abduction of the right shoulder due to pain" and tenderness in Plaintiff's upper back, lower back, and both thighs. (Tr. 1585). Dr. Warren instructed Plaintiff to resume Lyrica and take tramadol as needed for pain. *Id.*

---

4. A later note indicated Plaintiff "attended eval and a body mechanics lecture and decided to leave the program as it w[a]s not appropriate." (Tr. 1421-22).

In September 2014, Plaintiff again saw Dr. Warren, complaining "of significant pain involving her shoulders, lower back, and of balance problems." (Tr. 2664). She reported "difficulty standing up from a stooped position because of problems with balance as well as pain in the lower back and shoulders." *Id.* On examination, Dr. Warren noted shoulder abduction pain, low back tenderness, and "a normal tandem gait". (Tr. 2668).

In October 2014, Plaintiff had lumbar and cervical spine MRIs (Tr. 3144, 3156), a brain MRI (Tr. 3318) as well as an EMG (Tr. 2223). The lumbar spine MRI was negative (Tr. 3144) and the cervical spine MRI showed: "persistent reversal of the cervical lordosis consistent with muscular spasm or strain", "limited broad-based annular displacement at the C5 level with no evidence of frank disc herniation or canal stenosis" and "[m]ild bilateral uncovertebral arthrosis at the C5 level but no significant associated neuroforaminal compromise" (Tr. 3156). The brain MRI "showed a lot of white matter disease" (Tr. 3318). The EMG (performed due to neck pains and bilateral upper extremity pains) showed bilateral moderate carpal tunnel syndrome, worse on the right, and bilateral multi-level cervical radiculopathy. (Tr. 2223).

In November 2014, Plaintiff saw Alexander Grant, M.D., on referral from Dr. Waters, regarding possible multiple sclerosis. (Tr. 3109-14)[5]. Plaintiff reported hand tremors, memory changes, back and neck pain. (Tr. 3110). Dr. Grant noted a normal full strength and sensory examination. (Tr. 3113). Plaintiff's "gait was stable and independent but [she] had difficulty with tandem gait", *id.*, and Dr. Grant assessed "a nonspecific gait impairment" (Tr. 3115). Dr. Grant noted Plaintiff's symptoms were not consistent with MS and were "more consistent with fibromyalgia and considering xerostomia and xerophthalmia". (Tr. 3114).

---

5. This record is duplicated at Tr. 3045-50.

Plaintiff returned to Dr. Warren in September 2015, reporting "generalized musculoskeletal pain particularly . . . involving the lower extremities" and "worsening balance problems over the past 2 months." (Tr. 2430). Dr. Warren prescribed a cane and noted: "Question some balance problem may be related to sedating medicines such as Flexeril, Lyrica, and Vicodin." (Tr. 2434).

Also in September 2015, Plaintiff was seen in the emergency room after a fall at the park while walking her dog. (Tr. 3186). Notes indicate "[t]he fall was describe as slipped". *Id.* Emergency room providers observed right leg tremor. (Tr. 3189). Plaintiff was assessed with accidental fall, general weakness, and tremor. (Tr. 3192). Home health care was ordered. *Id.* Her home care nurse visited the following day, and Plaintiff reported she "does not feel like her psychiatric medications are working and killing herself is on her mind." (Tr. 3179).

That same month, Plaintiff underwent a physical therapy evaluation. (Tr. 3180). Notes indicate a plan for "gait and balance training as well as ordering a 4WW." *Id.* Plaintiff, through Dr. Waters placed an order for an aluminum rollator with a walker seat attachment. (Tr. 3168).

A few days later, Plaintiff reported to the emergency room after suffering another fall, "described as lost balance". (Tr. 2906). At a later home health appointment, it was reported Plaintiff used the cane in her apartment, and used her walker outside. (Tr. 3211)

Later that month, Plaintiff reported balance and falling issues to Dr. Waters. (Tr. 3080). Dr. Waters noted "all her tests are coming out normal" but that "she would like to get a shower seat and a grab bar [for her] shower because of the tremors she feels so unsteady she is afraid she is going to fall". *Id.* Dr. Waters recommended "[h]ome health care for shower seat and grab bar" and "healthy diet and exercise try to increase physical activity". (Tr. 3086).

11

At a September 2015 visit with Augusto Juguilon, M.D., Plaintiff used a walker. (Tr. 2955). She had "moderate tremors in both upper limbs but not lower limbs. *Id.* Dr. Juguilon assessed benign essential tremor and peripheral neuropathy, and adjusted Plaintiff's medications. *Id.* Plaintiff returned later that month, and Dr. Juguilon noted her tremors were "not any better". (Tr. 2954). Plaintiff also reported generalized aches and pains from fibromyalgia. *Id.* Dr. Juguilon noted Plaintiff had "definite tremors in both upper limbs" and was "tender to every limb that is being examined." *Id.* She walked "unassisted" and "with her guide dog". *Id.*

In December 2015, Dr. Waters noted Plaintiff was "now oxygen dependent as well as walks with a walker because she was having frequent falls". *Id.* However, in her review of systems, Dr. Waters noted "no difficulty walking, no headache, no limb weakness, no numbness and no tingling." (Tr. 3070). Dr. Waters instructed Plaintiff to follow up with her psychiatrist "and see if he wants [you] to be on an anti-anxiety medicine", as well as "recommend[ed] daily exercise increase physical activity for weight loss." (Tr. 3075).[6]

*Mental Health Records After Alleged Onset Date*

In March 2012, Plaintiff saw Jeffrey Holcomb, a psychiatric counselor. (Tr. 533-37). Plaintiff reported stress regarding her parents' health and a diagnosis of bipolar disorder. (Tr. 533). She reported poor sleep and appetite, an "up and down, often fatigued" energy level, anxiety, and panic attacks. *Id.* Mr. Holcomb noted Plaintiff was alert and oriented, her appearance was neat,

---

6. Plaintiff also cites additional evidence that was not before the ALJ, but submitted to the Appeals Council. *See* Doc. 13, at 9-10. When the Appeals Council declines to review the ALJ's decision, the ALJ's decision becomes the Commissioner's final decision. *Cotton v. Sullivan*, 2 F.3d 692, 696 (6th Cir. 1993). While new and material evidence may be submitted for consideration to the Appeals Council, "we still review the ALJ's decision, not the denial of review by the appeals council." *Casey v. Sec'y,* 987 F.2d 1230, 1233 (6th Cir. 1993). Although Plaintiff summarizes this evidence, she has not argued this evidence was new and material, nor does she request a sentence six remand.

her motor behavior hyper, her mood labile, and affect congruent. (Tr. 535). Her speech was rapid and pressured, her thought process tangential, thought content clear, attention was good, concentration fair, and memory intact. *Id.* He assessed Bipolar I disorder. *Id.* Mr. Holcomb later completed a form for the Social Security Administration noting Plaintiff had presented with paranoid ideation, depressed mood, and occasional bizarre affect. (Tr. 530). He noted poor concentration, impaired memory, signs of confusion, and a low frustration tolerance. *Id.* He also noted difficulty with social interaction, and Plaintiff "sometimes has difficulty doing any household chores." *Id.* He explained he "only saw [Plaintiff] a few times, last time 3/14/12". (Tr. 531). He was "uncertain" how her symptoms would respond to treatment, and she was not compliant with medications. *Id.* ("Periodically client would not take meds.").

In November 2012, Plaintiff underwent an adult mental health assessment at Ohio Guidestone with Andrea O'Brien. (Tr. 1110-15). Her symptoms were assessed to be "severe" and her level of functioning impairment to be "moderate". (Tr. 1110).

Throughout 2013 and 2014, Plaintiff received in-home counseling with social worker Marilyn King from Ohio Guidestone. *See* Tr. 1994-2059. These records reflect discussions regarding Plaintiff's anxiety, depression, including stressors and coping skills. *See id.*

In February 2014, Plaintiff saw Ohio Guidestone caseworker Melanie Fenske. (Tr. 1988). Plaintiff reported a dry mouth and that she was shaking "constantly." *Id.* She asked to be taken off her medication and reported her anxiety was "through the roof". *Id.* Plaintiff also reported lack of appetite, poor sleep, and not showering regularly. *Id.*

Also in May 2014, Plaintiff reported to her psychiatric nurse that she "continue[d] to be overwhelmed with her current circumstances" including being her "mother's caregiver with recent surgery." (Tr. 1990). She "felt close to taking herself to the hospital for admittance but realized

she wouldn't have her 'coping mechanisms' so she decided to stay home but feels like it wasn't fair for her children to see her like that." (Tr. 1990-91).

In May 2014, Ms. King wrote a letter to psychiatrist George Pallotta, noting that she had seen regression in Plaintiff "[o]ver the last few weeks." (Tr. 2059). She explained: "[a]t home, [Plaintiff] lacks energy and has difficulty cleaning the home and meeting basic needs." *Id.* She noted that "Last month she had more energy and [was] in a better mood." *Id.*

In June 2014, Plaintiff had a medication management session with Dr. Pallotta, at which nursing staff noted Plaintiff was currently taking Wellbutrin, Buspar and Ambien, and Dr. Pallotta added Prozac. (Tr. 2057-58).

In July 2014, Plaintiff's Ohio Guidestone caseworker, Melanie Fenske noted Plaintiff was "visibly anxious" with tremors and a clenched jaw. (Tr. 1983). Plaintiff requested a letter recommending a service pet. *Id.* Dr. Pallotta wrote a letter to Plaintiff's landlord supporting her having a dog in her apartment\ (Tr. 1985-87). Ms. King noted Plaintiff would "walk her dog twice a day to manage anxiety and to obtain a calming effect." *Id.*

In December 2014, Plaintiff underwent neuropsychological testing. (Tr. 3062-69). The examiner noted Plaintiff brought her emotional support dog to the appointment, and recounted her own history "in a slow and hesitant fashion." (Tr. 3062). Her affect was noted to be restricted, and she "showed mild distractibility". *Id.* Her problem solving was "slow and hesitant." *Id.* The evaluation "revealed a pattern of variable cognitive inefficiency" with "[t]he most consistent finding" being "slow speed of information processing." *Id.* She performed better on more complex tasks than on simple ones. *Id.* "Taken together, the profile is most consistent with cognitive inefficiencies that are secondary to diffuse systemic dysfunction, pain, and emotional disturbance. *Id.* Plaintiff also "indicated severe levels of depression and anxiety." *Id.*

14

In late November 2015, Plaintiff was admitted to the behavioral health unit of the hospital due to mental symptoms. (Tr. 3004). On discharge, providers noted that "[o]verall, the patient was minimally invested in receiving any care." *Id.* They also noted she "displayed some characterological issues" in that she would "openly idealize some care providers in a flirtatious way, while minimizing others." *Id.* Her exit exam showed she was cooperative, with good eye contact, normal speech, goal-directed thoughts, and she denied suicidal thoughts. (Tr. 3005). Her affect was "[p]leasant and congruent", she was noted to have no anxiety, and no short or long term memory deficits. *Id.* Her gait was also noted to be normal. *Id.*

A few days later, on December 9, 2015, Plaintiff followed up with Dr. Waters. (Tr. 3069-75). Dr. Waters reported the hospital stay was due to "an apparent suicide attempt" and "significant depression to the point where she was nonfunctional." (Tr. 3069).

*Opinion Evidence – Physical Limitations*

In April 2014, Dimitri Teague, M.D., reviewed Plaintiff's records at the request of the state agency and opined Plaintiff could perform light work with frequent climbing of ramps and stairs; frequent balancing, stooping, kneeling, and crouching, occasional crawling; and never climbing ladders, ropes, and scaffolds. (Tr. 90-91). Dr. Teague opined Plaintiff had limited ability to reach "[r]ight [o]verhead" and bilateral limitations in handling, fingering, and feeling, she would be limited to "[f]requent reaching RUE and frequent handling, fingering and feeling BUE due to fibromyalgia, decreased strength, R shoulder tendinosis, and neuropathy." (Tr. 91). He opined Plaintiff should avoid concentrated exposure to vibration, fumes, odors, dusts, gases, and poor ventilation, and avoid all exposure to hazards. (Tr. 92).

15

In June 2014, Dr. Warren completed an assessment of Plaintiff's physical limitations. (Tr. 1981-82). He opined Plaintiff could occasionally[7] lift and carry fifteen pounds, and frequently lift or carry ten pounds due to her history of right rotator cuff tear and cervical disc displacement. (Tr. 1981). He opined Plaintiff could stand or walk for four hours in an eight-hour workday (thirty minutes at one time) due to tenderness in the lower back and knee. *Id.* He thought Plaintiff could sit for five hours (one hour without interruption), due to lower back pain. *Id.* Dr. Warren opined Plaintiff could rarely[8] stoop, crouch, kneel, or crawl, but occasionally climb or balance. *Id.* She could occasionally reach, push, pull, or perform fine and gross manipulation. (Tr. 1982). This was due to her cervical spondylosis and history of right rotator cuff tear. *Id.* Dr. Warren opined Plaintiff would have restrictions to heights, moving machinery, temperature extremes, and pulmonary irritants because of diabetes and medications "that may cause sedation and balance problems." *Id.* He also indicated Plaintiff had not been prescribed a cane or walker (among other things), but had been prescribed a TENS unit, and wrist splits. *Id.* He opined Plaintiff would need to be able to alternate positions between sitting, standing, and walking at will. *Id.* Dr. Warren opined Plaintiff experienced "moderate" pain that would take her off task and cause absenteeism. *Id.* Finally, she would require an additional one hour of rest time during an average workday in addition to normal breaks. *Id.*

In September 2014, Eli Perencevich, D.O., reviewed Plaintiff's records at the request of the state agency. (Tr. 135-38). He reached the same conclusions as Dr. Teague. *Id.*

In October 2015, Dr. Waters completed a functional capacity assessment. (Tr. 3002-03). She opined Plaintiff had no limitations in lifting/carrying, standing/walking, or sitting. (Tr. 3002).

---

7. The form defined "occasional" as "from very little up to 1/3 of the workday". (Tr. 1981).
8. The form defined "rare" as "the activity cannot be performed for any appreciable period of time". (Tr. 1981).

Plaintiff could occasionally[9] climb, stoop, kneel, and crawl; could frequently[10] balance or crouch; and frequently reach, push, pull, and perform both fine and gross manipulations. (Tr. 3002-03). Dr. Waters opined Plaintiff had no environmental limitations, and experienced pain, but not to a degree that it would interfere with concentration, take her off task, or cause absenteeism. (Tr. 3003). She noted a TENS unit was prescribed, but a walker, brace, breathing machine, oxygen, and wheelchair were not. *Id.* She did not indicate if a cane was prescribed. *Id.*

*Opinion Evidence – Mental Limitations*

In September 2015, Ms. King completed a medical source statement regarding Plaintiff's mental capacity. (Tr. 2484-85). She opined Plaintiff could occasionally[11]: follow work rules; use judgment; respond appropriately to changes in routine settings; deal with the public; relate to co-workers; interact with supervisors; and function independently without redirection. (Tr. 2484). She opined Plaintiff could rarely[12]: maintain attention and concentration for extended periods of two hour segments; understand, remember, and carry out job instructions of any kind; maintain regular attendance and be punctual within customary tolerance; work in coordination with or proximity to others without being distracted or distracting; deal with work stress; and complete a normal workday and workweek without interruption from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods. (Tr. 2484-85). She opined Plaintiff could frequently maintain her appearance, but only occasionally socialize, behave in an emotionally stable manner, relate predictably in social situations, or leave the home on her

---

9. The form defined "occasional" as "from very little up to 1/3 of the workday". (Tr. 3002).
10. The form defined "frequent" as "1/3 to 2/3 of the workday". (Tr. 3002).
11 The form defined "occasionally" as "ability for activity exists for up to 1/3 of a work day." (Tr. 2484).
12 The form defined "rarely" as "activity cannot be performed for any appreciable time." (Tr. 2484).

own. *Id.* She could rarely manage funds or schedules. *Id.* As the diagnosis supporting the assessment, Ms. King noted depression and anxiety, as well as Plaintiff had "a therapy dog – using a cane/walker currently/has vis[i]ble tremors". *Id.*

VE Testimony

A VE appeared and testified at the hearing before the ALJ. (Tr. 65-77). The ALJ first asked him to consider a hypothetical individual of the same age, education and work history as Plaintiff who physically: could "engage in light exertion", "should never climb any ladders ropes, or scaffolds", "can frequently climb ramps and stairs", "[c]an frequently balance, stoop, kneel, crouch, and occasionally crawl", "[i]s limited to frequent reaching with the right upper extremity and frequent handling, fingering and feeling, bilaterally", "should avoid concentrated exposure to vibration and respiratory irritants", and should "avoid exposure to all hazards such as unprotected heights and operating dangerous equipment such as power saws and hammer jacks." (Tr. 66-67). Regarding mental limitations, the ALJ noted the individual would have: "[n]o memory limitations", "can perform jobs that have simple and detailed instructions, at a consistent pace with normal breaks, where she would not be expected to maintain concentration for extended periods", "[s]hould not work with the general public"[13], "can work at a job where interactions with coworkers and supervisors is up to occasionally", and "[i]s limited to routine but infrequent type of changes in the work environment." (Tr. 69). The VE testified that such an individual could not perform any of her past relevant work, but could perform other jobs such as assembler, bench assembler, and mail clerk. (Tr. 70-71).

In a second hypothetical, the ALJ asked the VE to consider the same hypothetical, but noted the individual "can interact with general public, coworkers and supervisors up to

---

13. The ALJ later clarified that "contact is acceptable." (Tr. 71).

occasionally . . . . without limitation." (Tr. 71-72). The VE testified that the individual could perform the same jobs previously identified. (Tr. 72).

In a third hypothetical, the ALJ asked the VE to consider the medical source statement of Dr. Waters. *Id.* The VE testified such an individual would be able to perform some of Plaintiff's past work. (Tr. 73). Finally, in a fourth hypothetical, the ALJ asked the VE to consider a hypothetical based on the medical source statement from Dr. Warren. *Id.* The VE testified such an individual could not perform any work. *Id.*

Plaintiff's counsel then asked the VE to consider a hypothetical individual in line with the ALJ's first hypothetical, but who could "interact with familiar coworkers on an occasional basis", and would "receive intermitted supervision in a setting where she's not required to interact with the general public." (Tr. 74). The VE stated that such requirements would "require significant accommodation" in the workplace. (Tr. 75). Finally, the VE testified that an individual who was off task for equal to or greater than 20% of the work day or work week on a consistent basis would not be able to work. (Tr. 75-76).

ALJ Decision

In her written decision, the ALJ found Plaintiff met the insured status requirements of the Social Security Act through December 31, 2016, and had not engaged in substantial gainful activity since January 1, 2012, her alleged onset date. (Tr. 15). She found Plaintiff had severe impairments of: degenerative disc disease of the cervical spine, fibromyalgia, right shoulder tendinosis, carpal tunnel syndrome, benign essential tremor, asthma, migraine headaches, and depression; but these impairments—singly or in combination—did not meet or medically equal the severity of a listed impairment. *Id.* The ALJ then concluded Plaintiff had the residual functional capacity to:

perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except never climb any ladders, ropes, or scaffolds; can frequently climb ramps and stairs; can frequently balance, stoop, kneel, crouch and occasionally crawl; is limited to frequent reaching with right upper extremity and frequent bilateral handling, fingering, and feeling; must avoid concentrated exposure to vibration and respiratory irritants; avoid exposure to all hazards such as unprotected heights and operating dangerous equipment such as power saws and hammer jacks, and with respect to her mental impairment, the claimant has no memory limitations, can perform jobs that have simple and detailed instructions at a consistent pace with normal breaks where she would not be expected to maintain concentration for extended periods; can have occasional interaction with coworkers and supervisors; should not work with the general public but contact is acceptable, and the claimant is limited to routine but infrequent type changes in the work environment.

(Tr. 18). The ALJ found Plaintiff could not perform past relevant work, and was 49 years old at her alleged onset date (a "younger individual" per the regulations), but turned 50 shortly after her alleged onset date (an individual "closely approaching advanced age" per the regulations). (Tr. 22-23). The ALJ then concluded, considering Plaintiff's age, education, work experience, and RFC, there were other jobs existing in significant numbers in the national economy that Plaintiff could perform. (Tr. 23). Therefore, the ALJ determined Plaintiff was not disabled. (Tr. 24).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or

indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

## STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a) & 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. §§ 404.1520 and 416.920—to determine if a claimant is disabled:

1.     Was claimant engaged in a substantial gainful activity?

2.     Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3.     Does the severe impairment meet one of the listed impairments?

4.     What is claimant's residual functional capacity and can claimant perform past relevant work?

5.     Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters,* 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.*

21

Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f) & 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

DISCUSSION

Plaintiff argues the ALJ erred in two ways: 1) in her evaluation of medical opinion evidence—specifically that of treating physician Dr. Van Warren, and social worker Ms. King; and 2) in her assessment of Plaintiff's RFC. Plaintiff specifically contends the ALJ: 1) should have included the use of a cane or walker in her assessment of Plaintiff's RFC; 2) failed to provide substantial evidence to support her assessment of Plaintiff's use of her upper extremities; and 3) failed to perform a proper pain analysis. The Commissioner responds the ALJ's assessment of the medical opinion evidence comported with the regulations, and the RFC determination is supported by substantial evidence.

Medical Opinion Evidence

Plaintiff contends the ALJ erred in considering two medical opinions in the record—treating physician Dr. Warren, and social worker Ms. King.

### *Treating Physician - Dr. Warren*

Generally, medical opinions of treating physicians are accorded greater deference than non-treating physicians. *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 242 (6th Cir. 2007); *see also* SSR 96–2p, 1996 WL 374188.[14] "Because treating physicians are 'the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairments and

---

14. Although recent revisions to the CFR have changed the rules regarding evaluation of medical evidence, such changes were effective March 27, 2017, and do not apply to decisions issued prior to that date. *See* Social Sec. Admin., *Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 Fed. Reg. 5852-53, 2017 WL 168819.

22

may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone,' their opinions are generally accorded more weight than those of non-treating physicians." *Rogers,* 486 F.3d at 242.

A treating physician's opinion is given "controlling weight" if it is supported by: 1) medically acceptable clinical and laboratory diagnostic techniques; and 2) is not inconsistent with other substantial evidence in the case record. *Id.* (citing *Wilson v. Comm'r of Soc. Sec.,* 378 F.3d 541, 544 (6th Cir. 2004)). When a treating physician's opinion does not meet these criteria, an ALJ must weigh medical opinions in the record based on certain factors. 20 C.F.R. § 416.927(c)(2). In determining how much weight to afford a particular opinion, an ALJ must consider: (1) examining relationship; (2) treatment relationship—length, frequency, nature and extent; (3) supportability—the extent to which a physician supports his findings with medical signs and laboratory findings; (4) consistency of the opinion with the record as a whole; and (5) specialization. *Id.*; *Ealy v. Comm'r of Soc. Sec.,* 594 F.3d 504, 514 (6th Cir.2010).

Importantly, the ALJ must give "good reasons" for the weight he gives a treating physician's opinion, reasons that are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.* An ALJ's reasoning may be brief, *Allen v. Comm'r of Soc. Sec.,* 561 F.3d 646, 651 (6th Cir.2009), but failure to provide any reasoning requires remand. *Blakley v. Comm'r of Soc. Sec.,* 581 F.3d 399, 409–10 (6th Cir.2009). A conclusory statement that a treating physician's opinion is inconsistent with the record is insufficient to satisfy the rule. *See Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 551 (6th Cir. 2010). "Put simply, it is not enough to dismiss a treating physician's opinion as 'incompatible' with other evidence of record; there must be some effort to

identify the specific discrepancies and to explain why it is the treating physician's conclusion that gets the short end of the stick." *Id.* at 552.

Here the ALJ explained Dr. Warren's opinion, and the weight she found it due:

Little weight is given to the medical source statement completed by Dr. Warren dated June 25, 2014. He noted that the claimant can lift and carry up to 15 pounds occasionally, stand and walk for four hours and sit for five hours and rarely stoop, crouch, kneel or crawl but the overall evidence in the record as set forth above establishes that the claimant is not that limited (Exhibit 36F).

(Tr. 22).

Plaintiff contends the ALJ "erred by not being specific or detailed in rejecting the treating physician's opinion, and did not apply the factors set forth in 20 CFR § 404.1527(d)(2)." (Doc. 13, at 15). Respondent contends the ALJ's reference to "the overall evidence in the record as set forth above" (Tr. 22), "incorporated the discussion of inconsistencies on the prior pages." (Doc. 14, at 8).

Although the ALJ stated Dr. Warren's opinion was inconsistent with "the overall evidence" (Tr. 22), the ALJ fails to "identify the specific discrepancies and to explain why it is the treating physician's conclusion that gets the short end of the stick." *Friend*, 375 F. App'x at 552. The Commissioner is correct that the ALJ addressed the overall record on the prior pages, *see* Tr. 18-20 treatment records on the prior page. *See* Tr. 20. However, the ALJ's discussion of those records is mostly a summary of what they contained, without an analysis of how those records are inconsistent with Dr. Warren's opinion. *Compare*, *e.g.*, *Daniels v. Comm'r of Soc. Sec.*, 2014 WL 1304940, *12 (N.D. Ohio) ("The ALJ's discussion of the medical evidence was not merely a rote recitation of Plaintiff's longitudinal history; rather the ALJ analyzed the medical evidence and explained how it supported his ultimate RFC determination."). Moreover, this failure to identify specific discrepancies is further compounded by the ALJ's silence on Dr. Warren's functional

24

restrictions involving Plaintiff's upper extremities. *Compare* Tr. 20 (acknowledging Plaintiff's lifting carrying, standing, walking, and postural restrictions) *with* Tr. 1981-82 (Dr. Warren's opinion including limitations to "occasional" reaching, pushing, pulling, and manipulation). Because the ALJ did not acknowledge these restrictions opined by Dr. Warren, it is impossible for the Court to determine if those restrictions were rejected or simply overlooked.[15]

Therefore, the undersigned finds the ALJ erred in her consideration of treating physician Dr. Warren's opinion. As such, remand is required for the Commissioner to perform a full analysis of Dr. Warren's opinion.

### *Social Worker – Ms. King*

Under the regulations, a "treating source" includes physicians, psychologists, or "other acceptable medical source[s]" who provide, or have provided, medical treatment or evaluation and

---

15. The cases cited by the Commissioner in response do not compel a contrary conclusion. In *Hernandez v. Comm'r of Soc. Sec.*, the Sixth Circuit found sufficient an ALJ's rejection of a treating physician's opinion because it was not supported by objective medical evidence in the record "as discussed above" and noted that "[a]lthough the ALJ did not specifically identify the previously discussed objective medical evidence, it is clear which evidence he was referring to and thus strict compliance with the regulations is not necessary in this instance". 644 F. App'x 468, 474 (6th Cir. 2016). There**,** the Sixth Circuit explained that it was "clear which evidence [the ALJ] was referring to" as not supporting the ALJ's decision, and, moreover, it was "nearly impossible to analyze whether this is true [the evidence was inconsistent] because [the physician's] check-box analysis is not accompanied by any explanation." *Id.* Thus, the court in *Hernandez* held: "Even if the ALJ erred in failing to give good reasons for not abiding by the treating physician rule, it was harmless error because the MSS here is 'weak evidence at best' and meets our patently deficient standard." *Id.* at 474-75 (citing *Friend*, 375 F. App'x at 551). By contrast, here, it is not clear what evidence in "the overall evidence in the record as set forth above" the ALJ determined to contradict Dr. Warren's opinion. (Tr. 22). And, the Commissioner has not argued, nor did the ALJ find, Dr. Warren's opinion so "patently deficient" as to not be credited. In *Crum v. Comm'r of Soc. Sec.*, the Sixth Circuit explained an ALJ's statement that a treating physician's opinion was "not consistent with the past treatment records" was supported where, "[e]lsewhere in her decision, the ALJ laid out in detail the treatment records that showed Crum could return to normal work activity", including specific statements by both providers and from the claimant himself that he could return to work. *Id.* By contrast, here, the records summarized by the ALJ show ongoing symptoms, and no such explicit statements about ability to work. *See* Tr. 18-20.

who have, or have had, an ongoing treatment relationship with the claimant. 20 C.F.R. §§ 404.1502; 416.902. An "acceptable medical source" includes "licensed physicians" and "licensed or certified psychologists." 20 C.F.R. §§ 404.1513(a)(1)-(2); 416.913(a)(1)-(2). Evidence from those who are "not acceptable medical sources" or "other sources", including nurse practitioners, "are important and should be evaluated with key issues such as impairment severity and functional effects, along with other relevant evidence in the file." SSR 06-03, 2006 WL 2329939, at *2. Interpreting SSR 06-03, the Sixth Circuit found that "[o]pinions from non-medical sources who have seen the [Plaintiff] in their professional capacity should be evaluated by using the applicable factors, including how long the source has known the individual, how consistent the opinion in with other evidence, and how well the source explains the opinion." *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 541 (6th Cir. 2007). An ALJ has "broad discretion" when evaluating an "other source" opinion. *Brown v. Comm'r of Soc. Sec.*, 591 F. App'x 449, 451 (6th Cir. 2015).

The ALJ explained the weight he assigned Ms. King's opinion:

Little weight is also given to the medical source statement completed by Marilyn King, MALSW dated September 29, 2015. She noted that the claimant can rarely maintain attention and concentration for extended periods of two hour segments, rarely maintain regular attendance or complete a normal workday and workweek, rarely deal with stress, rarely work in coordination with or in proximity to others without being distracted and rarely understand, remember or carry out job instructions but the claimant's treatment records from Guidestone do not indicate that the claimant is that limited. Furthermore, Ms. King is not an acceptable medical source per 20 CFR 404.1513, 416.913 (Exhibit 44F).

(Tr. 22).

The ALJ is correct, and Plaintiff does not contest, that Ms. King is not an "acceptable medical source" under the regulations. Ms. King's opinion is therefore not afforded the same deference as a treating physician, nor does the ALJ have to follow the "good reasons" requirement with regard to her opinion. *See* SSR 06-03p, 2006 WL 2329939, at *2; *Leach v. Comm'r of Soc.*

*Sec.*, 2015 WL 1221925, at *3 (N.D. Ohio). The ALJ here adequately considered and discussed Ms. King's opinion, stating that she found it unsupported by the treatment record. Plaintiff contends Ms. King's treatment notes show "anxiety, depression, stress, poor coping skills, negative thinking patterns, [and] distorted cognitive patterns." (Doc. 13, at 17) (citing Tr. 2003-54). However, these records also reflect Ms. King frequently assessed Plaintiff as making progress, using coping skills, and having increased insight into her condition. *See* Tr. 2003-54. Moreover, the notes do not reflect notations about Plaintiff's ability to concentrate, work with others, or her memory. These records stand in contrast to Ms. King's opinion that Plaintiff could "rarely" maintain attention and concentration, work with or in proximity to others, or remember and carry out any job instructions. *See* Tr. 2484-85.

Additionally, earlier in her decision, the ALJ discussed records contrary to Ms. King's opinion regarding Plaintiff's ability to concentrate. *See* Tr. 17 ("Mr. Holcomb notes that the claimant's attention and concentration was fair to good [citing Tr. 535]" and "When the claimant was recently discharged from Oakview Behavioral Health on December 3, 2015, it was noted that she had good focus and concentration [citing Tr. 3005]."). The ALJ also earlier evaluated Plaintiff's social functioning limitations, noting that she "continues to maintain a relationship with her husband even though they are separated" and "also maintains relationships with her mother and mother-in-law." (Tr. 17). It is for the ALJ to resolve these inconsistencies in the record, and her conclusion that Ms. King's treatment notes do not support the restrictions in her opinion is supported by substantial evidence.

RFC Analysis

A claimant's RFC is an assessment of "the most [she] can still do despite [her] limitations." 20 C.F.R. § 416.945(a)(1). An ALJ must consider all symptoms and the extent to which those

symptoms are consistent with the objective medical evidence. § 416.929. The RFC determination

is one reserved for the ALJ. 20 C.F.R. § 416.946(c); *Poe v. Comm'r of Soc. Sec.,* 342 F. App'x

149, 157 (6th Cir.2009) ("The responsibility for determining a claimant's [RFC] rests with the

ALJ, not a physician."); SSR 96–5p, 1996 WL 374183, at *5.

*Use of Cane or Walker*

First, Plaintiff contends the ALJ should have incorporated a cane or walker into her final

RFC because evidence showed these items prescribed. (Doc. 13, at 19). In the same vein, Plaintiff

argues the ALJ failed to address evidence in the record that she had a history of falling. *Id.* at 20.

The Commissioner responds that the ALJ properly considered the evidence of cane usage, but

found it inconsistent with other evidence in the record, and there was therefore no error. (Doc. 14,

at 14-15).

> Regarding the use of a cane:

> [T]he Sixth Circuit has held that if a cane is not a necessary device for the claimant's use, it cannot be considered a restriction or limitation on the plaintiff's ability to work. *Carreon v. Massanari,* 51 Fed.Appx. 571, 575 (6th Cir.2002). This device must be so necessary that it would trigger an obligation on the part of the Agency to conclude that the cane is medically necessary. *Penn v. Astrue,* 2010 WL 547491, at *6 (S.D.Ohio Feb.12, 2010). A cane would be medically necessary if the record reflects more than just a subjective desire on the part of the plaintiff as to the use of a cane. *Id.* If the ALJ does not find that such device would be medically necessary, then the ALJ is not required to pose a hypothetical to the VE. *Casey v. Sec'y of Health Servs.,* 987 F.2d 1230, 1235 (6th Cir.1993). The ALJ is only required to pose to the VE those limitations found to be credible. *Id.*

*Murphy v. Astrue,* 2013 WL 829316, at *10 (M.D. Tenn.), *report and recommendation adopted*

2013 WL 4501416. And, as another magistrate judge in this district recently explained:

> When the record contains prescriptions for walking assist devices, district courts in the Sixth Circuit have found that RFC determinations are not supported by substantial evidence when the ALJ, (i) acknowledged that a cane had been prescribed, (ii) did not include the use of the cane in the RFC, and (iii) provided no explanation for this omission. *See Jones v. Commissioner of Social Security*, No. 1:10CV840, 2012 WL 967509, at *5 (W.D. Mich. Feb.8, 2012); *Penn v. Astrue,* No. 2:09CV00169, 2010 WL 547491, at *5 (S.D. Ohio Feb.12, 2010); *Simmons v.*

*Comm'r of Soc. Sec.,* No. 1:12CV2591, 2013 WL 3873952, at * 12 (N.D. Ohio July 25, 2013).

*Watkins v. Comm'r of Soc. Sec.*, 2017 WL 6419350, at *11 (N.D. Ohio), *report and recommendation adopted by* 2017 WL 6389607. In contrast to these cases and *Shultz v. Comm'r of Soc. Sec.*, 2015 WL 3905065, at *17-18 (N.D. Ohio) (cited by Plaintiff), the ALJ here considered Plaintiff's cane usage, but found the record inconsistent on this point:

> Finally, it should be noted that there are inconsistencies in the record. For example, the claimant was prescribed a three-pronged cane by Van Warren, M.D. on September 2, 2015 due to complaints of balance problems and she was using it when seen by Augusto Juguilon, M.D. on September 15, 2015. However, Dr. Juguilon noted on October 12, 2015 that she walked unassisted.

(Tr. 20-21) (citing Tr. 2647, 2953, 2955). Moreover, earlier in her decision, that ALJ noted Plaintiff "has also demonstrated a normal gait on most occasions." (Tr. 19) (citing, *inter alia*, Tr. 1001, 1374, 2465, 2668, 3113, 3115).

The ALJ was correct that there was significant inconsistency in the record regarding Plaintiff's need for a cane / gait limitations. Although there was certainly evidence in the record to support cane usage and that Plaintiff had falls and balance issues, *see* Tr. 931, 2434, 2906, 2955, 3080, 3168, 3186, there was also substantial contrary evidence. For example, the records cited by the ALJ show that Dr. Warren prescribed a cane in September 2015 (Tr. 2647), but less than one month later, Dr. Juguilon noted Plaintiff was walking "unassisted" (Tr. 2953). Moreover, the ALJ cited evidence of a relatively normal gait spanning at least the time period from March 2013 through November 2014. *See* Tr. 19; Tr. 1001-02 (July 2013 notation of non-antalgic gait); Tr. 1374 (March 2013 note of "normal based" gait); Tr. 2465 (March 2014 note of "normal gait"); Tr. 2668 (September 2014 note of "normal tandem gait"); Tr. 3113-15 (November 2014 note of "stable and independent" gait, but "difficulty with tandem gait" and assessing a "nonspecific gait impairment").

Thus, the ALJ's decision reflects that she considered the evidence of Plaintiff's cane usage, and ultimately found it not fully credible due to inconsistencies in the record. It is an ALJ's duty, not this Court's to resolve such inconsistencies in the record. *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994); *see also Foster v. Halter*, 279 F.3d 348, 353 (6th Cir. 2001) ("Our role is not to resolve conflicting evidence in the record . . ."). Moreover, later records also contradict the need for a cane. *See* Tr. 3005 ("Gait normal" in December 2015 hospital discharge summary); Tr. 3070 (Dr. Waters's December 2015 notation of "no difficulty walking"); Tr. 3002-03 (Dr. Waters's October 2015 medical source statement stating standing/walking not affected and not answering the question of whether a cane had been prescribed).[16]

Thus, the ALJ's decision not to include a cane limitation in the ultimate RFC has the support of substantial evidence in the record. The ALJ therefore did not err in not questioning the VE about the use of a cane, as the ALJ is only required to include in a hypothetical question those limitations that he finds credible. *See Casey*, 987 F.2d at 1235.

*Use of Upper Extremities*

Second, Plaintiff contends the ALJ failed to "properly consider the combined effect of" Plaintiff's upper extremity conditions "when determining that [Plaintiff] could perform frequent reaching with the right upper extremity, no limitation in pushing/pull, and could perform frequent bilateral handling, fingers and feeling[.]" (Doc. 13, at 21). The Commissioner responds that the ALJ "did limit Plaintiff's ability to use her hands", limiting her to light work, and to "frequent"

---

16. In conjunction with her objection that the ALJ did not incorporate a cane into the RFC, Plaintiff contends the ALJ did not address Plaintiff's history of falls. *See* Doc. 13, at 20. It is well settled that an ALJ may consider the entire record without addressing each piece of evidence individually. *See Kornecky v. Comm'r of Soc. Sec.,* 167 F. App'x 496, 507-08 (6th Cir. 2006). And, this is essentially the same issue as Plaintiff's cane issue, in which, as noted above, the undersigned finds no error.

right upper extremity reaching, and "frequent" handling, fingering, and feeling bilaterally. (Doc. 14, at 15).

Because, as discussed above, the remand required regarding Dr. Warren's opinion involves this issue, the Court need not reach this question at this time. The ALJ did not provide any analysis of Dr. Warren's opinion that Plaintiff could only "occasionally" perform reaching, pushing, pulling, and manipulation. (Doc. 13, at 22) (citing Tr. 1982). On remand, the Commissioner can determine in the first instance whether a proper evaluation of Dr. Warren's opinion requires a re-evaluation of Plaintiff's upper extremity limitations.

*Pain Analysis*

Third, Plaintiff alleges the ALJ "failed to properly evaluate the pain evidence, in accordance with the law, in issuing her assessment of residual functional capacity." (Doc. 13, at 23). The Commissioner responds that the ALJ "properly evaluated Plaintiff's alleged symptoms in a manner that was consistent with SSA's regulations and policies." (Doc. 14, at 16).

Preliminarily, within Plaintiff's argument, she contends the ALJ erred, in part, by not applying new Social Security Regulation 16-3p, and using the term "credibility", which the new ruling eliminates. *See* Doc. 13, at 23-25. The Commissioner responds that the ALJ properly applied the prior ruling, SSR 96-7p, because it was in effect at the time of the ALJ's decision. The undersigned agrees with the Commissioner on this point. Effective March 27, 2016, SSR 96-7p has been superseded by SSR 16-3p, 2016 WL 1119029, which "provides guidance about how [the SSA] evaluate[s] statements regarding the intensity, persistence, and limiting effects of symptoms." *See* 2016 WL 1237954 (clarifying effective date of SSR 16-3p). The Sixth Circuit characterized SSR 16-3p as merely eliminating "the use of the word 'credibility' . . . to 'clarify that the subjective symptoms evaluation is not an examination of an individual's character.'"

31

*Dooley v. Comm'r of Soc. Sec.*, 656 F. App'x 113, 119 n.1 (6th Cir. 2016). The Social Security Administration has since stated SSR 16-3p is not to be applied retroactively. 82 Fed. Reg. 49462, 49468 n.27 (Oct. 25, 2017), available at https://www.gpo.gov/fdsys/pkg/FR-2017-10-25/pdf/2017-23143.pdf ("When a Federal court reviews our final decision in a claim, we also explain that we expect the court to review the final decision using the rules that were in effect at the time we issued the decision under review."). The ALJ's decision here was issued March 25, 2016—three days before the effective date of SSR 16-3p. Thus, the undersigned evaluates the ALJ's pain analysis / credibility determination under the ruling in effect at the time—SSR 96-7p. And, as such, there is no error in the ALJ's use of the term "credibility" as it was part of the rule in effect at the time of the ALJ's decision. *See* SSR 96-7p, 1996 WL 374186, at *4 ("The adjudicator must then make a finding on the credibility of the individual's statements about symptoms and their functional effects.").

When making a credibility finding, the ALJ must make a finding based on a consideration of the entire record. SSR 96-7p, 1996 WL 374186, *1. But, an ALJ is not bound to accept as credible Plaintiff's testimony regarding symptoms. *Cohen v. Sec'y of Dep't of Health & Human Servs.*, 964 F.2d 524, 529 (6th Cir. 1992). Analysis of alleged disabling symptoms turns on credibility. *See Hickey-Haynes v. Barnhart*, 116 F. App'x 718, 726-27 (6th Cir. 2004). "Because of their subjective characteristics and the absence of any reliable techniques for measurement, symptoms are difficult to prove, disprove, or quantify." SSR 82-58, 1982 WL 31378, *1.

With regard to a claimant's subjective symptoms, the regulations require an ALJ to consider certain factors, including: 1) daily activities; 2) location, duration, frequency, and intensity of pain or symptoms; 3) precipitating and aggravating factors; 4) the type, dosage, effectiveness, and side effects of any medication; 5) treatment, other than medication, to relieve

pain; 6) any measures used to relieve pain; and 7) other factors concerning functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 416.929(c); SSR 96-7p, 1996 WL 374186, at *3 ("20 CFR 44.1529(C) and 416.929(c) describe the kinds of evidence, including the factors below, that the adjudicator must consider in addition to the objective medical evidence when assessing the credibility of an individual's statements"). Although the ALJ must "consider" the listed factors, there is no requirement that she discuss every factor. *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 287 (6th Cir. 2009).

The ALJ "has the power and discretion to weigh all of the evidence and to resolve the significant conflicts in the administrative record." *Workman v. Comm'r of Soc. Sec.*, 105 F. App'x 794, 800-01 (6th Cir. 2004) (citing *Walters*, 127 F.3d at 531). In this respect, it is recognized that the ALJ's credibility assessment "must be accorded great weight and deference." *Id.* (citing *Walters*, 127 F.3d at 531); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 536 (6th Cir. 2001) (quoting *Myers v. Richardson*, 471 F.2d 1265, 1267 (6th Cir. 1972) ("[i]t [i]s for the [Commissioner] and his examiner, as the fact-finders, to pass upon the credibility of the witnesses and weigh and evaluate their testimony")). It is not for this Court to reevaluate such evidence anew, and so long as the ALJ's determination is supported by substantial evidence, it must stand. The ALJ found Plaintiff's subjective allegations to not be fully supported, a finding that should not be lightly disregarded. *See Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 780 (6th Cir. 1987); *see also Sims v. Comm'r of Soc. Sec.*, 406 F. App'x 977, 981 (6th Cir. 2011) (an ALJ's credibility assessment may only be disturbed for a "compelling reason"). In fact, as the Sixth Circuit has stated that an ALJ's credibility findings "are virtually unchallengeable." *Ritchie v. Comm'r of Soc. Sec.*, 540 F. App'x 508, 511 (6th Cir. 2013) (citation omitted).

33

Here, the ALJ appropriately cited the regulation regarding credibility / subjective symptoms (96-7p), and described the two–step process. (Tr. 18) (citing 20 C.F.R. §§ 404.1529, 416.929). After summarizing the evidence, the ALJ explained her credibility determination:

> Therefore, after careful consideration of the evidence, I find that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible.

(Tr. 20). As the reasons supporting this determination, the ALJ cited records from a then-recent inpatient stay at Oakview Behavioral Health, evidence of non-compliance with treatment, and inconsistencies in the record. (Tr. 20-21). The reasons given are supported by the record. *See* Tr. 3004 ("Overall, the patient was minimally invested in receiving any care."); Tr. 3005 (exit exam showing Plaintiff was "[c]ooperative", had "good eye content", with normal speech, and goal-directed thoughts, good focus, concentration, insight and judgment, as well as pleasant and congruent affect); Tr. 3005 (noting the "only medication adjustment . . . made . . . was to change Wellbutrin XL dosing from 150 milligrams twice a day to just daily" and "[t]he patient tolerated this change well."); Tr. 932 (noting obstructive sleep apnea and that Plaintiff "has mask but doesn't wear"); Tr. 2151 ("She has not been using CPAP. She is not sure that she has needed it."); Tr. 1359 ("She interrupted the session twice by taking phone calls and the session was ended as she would not end[] the second call."); Tr. 1359 ("She has filed for SSDI and does not plan to return to gainful employment in the foreseeable future. Should she change her mind, she feels she possessed ample transferable skills to find a job."); Tr. 1325 ("[S]he seems unreceptive to suggestions at this point."). And these are valid reasons for discounting Plaintiff's subjective symptom complaints. *See* 20 C.F.R. §§ 404.1529(c), 416.929(c); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 392 (6th Cir. 2004) (a claimant's credibility may be properly discounted "to a certain degree . . . where an [ALJ] finds contradictions among the medical reports, claimant's testimony,

and other evidence."); SSR 96-7p, 1996 WL 374186, at *7 ("[T]he individual's statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints, or if the medical reports or records show that eh individual is not following the treatment as prescribed and there are no good reasons for this failure."); *Tyrpak v. Astrue*, 858 F. Supp. 2d 872, 880 (N.D. Ohio 2012) ("[I]t is reasonable to expect that a claimant who is suffering from disabling pain will seek examination or treatment and the ALJ can doubt his credibility for a failure to do so."). Additionally, the ALJ noted Plaintiff's history of Ambien abuse. (Tr. 20) (citing Tr. 1358-59). The ALJ's provided specific reasons for finding Plaintiff's statements less than fully credible, supported by substantial evidence in the case record, and they are sufficiently specific to make clear to the Court the weight the ALJ gave to Plaintiff's statements and the reasons for that weight. *See* SSR 96-7p, 1996 WL 374186, at *2. Having found no "compelling reason" to disturb the ALJ's credibility determination, the undersigned recommends it be affirmed. *Sims*, 406 F. App'x at 981.

## CONCLUSION

Following review of the arguments presented, the record, and the applicable law, the undersigned finds the Commissioner's decision denying DIB and SSI not supported by substantial evidence, and therefore recommends the Court reverse and remand the Commissioner's decision for a proper evaluation of treating physician Dr. Warren's opinion.


      s/James R. Knepp II
      United States Magistrate Judge


*ANY OBJECTIONS* to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice. Failure to file objections within the specified time

WAIVES the right to appeal the Magistrate Judge's recommendation. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).